**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| THOMAS GENTILE, individually and on behalf of all others similarly situated, | |
|     Plaintiff, | Case No. 1:25-cv-376 |
| v. | Jury Demand |
| WOOD RIVER HEALTH SERVICES, INC., | Class Action |
|     Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Thomas Gentile ("Plaintiff"), brings this Class Action Complaint against Defendant Wood River Health Services, Inc. ("Defendant"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

## <u>INTRODUCTION</u>

1.     Plaintiff brings this class action complaint against Defendant for its failure to properly secure and safeguard the personal health information ("PHI") and personally identifiable information ("PII") of Plaintiff and other similarly situated current and former patients of Defendant ("Class Members"), resulting in a cybersecurity incident in which Class Members' PHI and PII was stolen while in Defendant's custody (the "Data Breach").

2.     Wood River Health Services, Inc. ("Defendant") is "a full-service medical, dental, and behavioral health care facility" providing healthcare services to thousands of patients like Thomas Gentile ("Plaintiff").[1]

---

[1] https://woodriverhealth.org/about/about-overview

3.      While "offering patient-centered care" to its clients,[2] Defendant failed to implement reasonable and adequate cybersecurity measures to protect its patients' information.

4.      At some point prior to August 8, 2024, an unauthorized threat actor accessed an email account belonging to an employee of Defendant.[3]

5.      After accessing the account, the hacker was able to compromise patient information.

6.      Between August 8, 2024, and September 6, 2024, the hacker(s) obtained PII and PHI belonging to Defendant's patients, including full names, dates of birth, Social Security numbers, driver's license numbers, passport numbers, patient account numbers, medical record numbers, electronic/digital signatures, employee identification numbers, health insurance information (such as group policy numbers, subscriber numbers, and claims information), medical information (such as diagnoses, physician identification, and treatment information), and financial information (such as billing, claims, and payment information).

7.      Nearly 55,000 patients have been, and will continue to be, affected by the Data Breach.[4]

8.      Plaintiff has been a patient of Defendant for 30 years, meaning Defendant collected and stored a stunning amount of medical (and financial) information about Plaintiff.

9.      The breach of this highly sensitive PHI and PII places Plaintiff and Class Members at a significant and substantially increased risk of identity theft and fraud.

10.     Upon information and belief, the Data Breach was caused by Defendant's failure to implement reasonable cybersecurity measures to protect the PII stored on its systems. For example,

---

[2] *Id.*
[3] https://woodriverhealth.org/patients/notice-of-data-event
[4] https://www.hipaajournal.com/wood-river-health-notifies-54k-patients-about-august-2024-data-breach/

had Defendant implemented reasonable cybersecurity intelligence tools to monitor for malicious activity and intrusion attempts, it likely would have been able to prevent, stop, or minimize the effect of the cyberattack.

## PARTIES

11.    Plaintiff is a natural person and citizen of Rhode Island, where he intends to remain.

12.    Defendant is a Rhode Island corporation headquartered at 823 Main Street, Hope Valley, Rhode Island, 02832, and can be served with process through its registered agent, Alison Croke, at that same address.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act because the amount in controversy exceeds $5,000,000, the number of class members is at least in the tens of thousands given the size of Defendant's operations, and minimal diversity exists, as Defendant also serves patients in the State of Connecticut.

14.    The Court has personal jurisdiction over Defendant because it is at home in this State, where it maintains its principal place of business.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is at home in this District, which is also where the events giving rise to this Class Action occurred.

## ADDITIONAL FACTUAL ALLEGATIONS

16.    As a condition of receiving services from Defendant, Plaintiff was required by Defendant to provide it with his PII and PHI (collectively "Private Information").

17.    Based on representations made by Defendant, Plaintiff believed Defendant had implemented and maintained reasonable security and practices to protect his Private Information.

18.     With this belief in mind, Plaintiff provided his Private Information to Defendant in connection with receiving medical services.

19.     Thus, Plaintiff's and Class Members' Private Information was provided to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access

20.     At all relevant times, Defendant stored and maintained Plaintiff's Private Information on its network systems.

21.     Plaintiff received a Notice of Data Security Incident from Defendant dated July 28, 2025.[5] According to the notice, the exposed patient information included Plaintiff's "name and patient account number, diagnosis, encounter number, treating/referring physician, health insurance group number, other health insurance information, medical record number, health insurance subscriber number, medical billing/claims information, treatment information, date of birth, [and] Social Security n[umber.]"

22.     Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

23.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

---

[5] Attached as **Exhibit A.**

24.     Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

25.     Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused and created by the Data Breach.

26.     As a direct result of the Data Breach, Plaintiff has suffered injuries and damages as alleged herein.

### *Defendant Failed to Comply with HIPAA Requirements*

27.     Defendant collects patient information in the course of tens of thousands of patient contacts.

28.     Healthcare providers like Defendant have a duty and responsibility to protect the sensitive personal and medical information entrusted to them by their patients.

29.     Federal law, among other sources, dictates special care due to sensitive personal medical information. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires healthcare providers and their business associates to take substantive measures to protect against the unauthorized access or disclosure of PHI, including but not limited to: (a) ensuring the confidentiality, integrity, and availability of PHI created, received, maintained, and transmitted; (b) preemptively identifying and protecting against reasonably anticipated threats to the security or integrity of PHI; (c) protecting against reasonably anticipated and foreseeable unauthorized uses or disclosures of PHI; (d) putting in place the required administrative and technical protections for PHI; (e) implementing data security policies and procedures to prevent, detect, contain, and remedy security breaches; and (f) effectively training and certifying their workforce concerning proper safeguards for PHI.

30.     Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

31.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

32.     HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

33.     HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

34.     HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

35.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

36.     HIPAA's Security Rule requires defendants to do the following:

- Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

- Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

- Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

- Ensure compliance by its workforce.

37.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

38.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

39.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

40.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Pt. 164, Subparts D or E. *See* 45 C.F.R. §

164.530(e).

41.   HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

42.   HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302–164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

43.   Defendant was at all times fully aware of its HIPAA obligations to protect the PHI of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendant Failed to Comply with FTC Guidelines*

44.     Similarly, Federal Trade Commission ("FTC") guidance dictates that the need for data security should be factored into all business decision-making. The FTC has issued numerous guidelines identifying best data security practices that companies like Defendant should employ to protect against the unlawful exposure of private information.

45.     According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

46.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

47.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable

security measures.

48.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

50.     Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### *Defendant Failed to Comply with Industry Standards.*

51.     Industry standards also establish best practices that at a minimum should be implemented by companies in possession of sensitive information, like Defendant.

52.     Experts studying cybersecurity routinely identify institutions that store Private Information like Defendant as being particularly vulnerable to cyberattacks because of the value

of the Private Information which they collect and maintain.

53.     The data privacy industry recognizes that data breaches are preventable, and that they occur when companies in possession of sensitive information fail to take reasonable and adequate measures to ensure that they (and any vendors to whom they entrust their patients' or customers' data) protect against unauthorized access.

54.     Companies like Defendant and the vendors that it utilized should follow best practices such as employee education; strong passwords; multi-layer security (including firewalls, anti-virus and anti-malware software); encryption- making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant, through its vendors, failed to follow these industry best practices, including a failure to implement multi-factor authentication.

55.     Other best cybersecurity practices that are standard for companies like Defendant and which should have been required of its vendors include installing appropriate malware detection software; monitoring and limiting  network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Defendant, through its vendors, failed to follow these industry best practices.

56.     Defendant, including through its vendors, also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's

Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

57.    The foregoing frameworks are existing, applicable industry  standards for a company's obligations to provide and ensure adequate data security for its consumers. Upon information and belief, Defendant (including through its vendors) failed to comply with at least one (and as many as all) of these accepted standards, thereby opening the door to threat actors and causing the Data Breaches.

***Defendant was Aware that Hackers and Cyber Criminals Covet and Oftentimes Target Healthcare Providers for PII/PHI***

58.    Defendant was aware that the PII/PHI that it managed, stored, and utilized was highly sensitive and of significant value to Plaintiffs and the Class, as well as those who would use it for wrongful or unlawful purposes such as identify theft.

59.    According to the National Association of Healthcare Access Management, personal medical data is up to ten times more valuable on the black market than credit card information. This is because unlike a stolen credit card that can easily be disabled by the holder or the holder's financial institution, most people are unaware that their personal medical information has been stolen.

60.    Of particular concern with the theft of PHI is the greatly increased threat of insurance, Medicare, and Medicaid fraud. Once criminals have obtained a patient's health insurance information, they can make fraudulent claims on the patient's policy, even maxing out their coverage limits. If this happens, it leaves the unsuspecting victim without health insurance coverage in the event of an emergency when they need it most.

61.    Phishing and other data attacks on healthcare institutions are far from rare, with

nearly 35% of all cyberattacks focused on the healthcare industry.[6] From 2009-2019, about 159 million patients had their sensitive PII/PHI compromised in a healthcare data breach.[7]

62.    Indeed, the Federal Trade Commission ("FTC") has published articles directed at business to make them aware of the significant threats that data breaches pose and to inform them of the duties they owe to customers to safeguard PII/PHI.

63.    One such article, *Protecting Personal Information: A Guide for Business,* informs business that they have a multitude of legal obligations to take reasonable and adequate precautions to safeguard the PII/PHI that their customers entrust to them. It even lays out the possible costs of a data breach, "losing your customers' trust and perhaps even defending yourself against a lawsuit," the threat of which make "safeguarding personal information ... just plain good business."[8]

64.    Based on these representations and warnings, Defendant possessed affirmative knowledge of the significant risks that it would be targeted in its possession of significant quantities of PII/PHI, the harms to itself and patients should a Data Breach occur, and the difficulties and significant costs associated with monitoring, detecting, and affectively remediating the threat and/or consequences of identify theft.

### *The Immediate and Long-Term Costs to Victims of Responding to the Improper Disclosure of their PHI Are Extensive*

65.    The Federal Bureau of Investigation estimates that fraud costs the average American family between $400 and $700 a year in premiums, additional costs that Plaintiffs and the Class will incur in addition to their identity theft risk mitigation costs.

---

[6] BlackKite Third Party Breach Report, pg. 8 (2023).
[7] Annals of Internal Medicine, *Types of Information Compromised in Breaches of Protected Health Information* (2020), available at https://www.acpjournals.org/doi/pdf/10.7326/M19-1759.
[8] Federal Trade Commission, Protecting Personal Information: A Guide for Business. https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business#LockIt.

66.     In a study conducted by the Ponemon Institute, nearly half of data breach victims who answered the survey reported that they had lost their health care as a result of the breach, with one third stating that their health insurance premiums increased after the breach occurred.[9]

67.     Consideration of the broader implications of data breaches, particularly of PHI, shows that data breaches are not just technical, harmless violations of patients' privacy rights. Once a bad actor gains access to a patient's PII/PHI, the consequences to the patient's life can be devastating and include not only medical related fraud and identity theft, but also can affect the patient's credit, finances, and overall financial well-being.

68.     According to the Ponemon Institute, the average total cost to resolve an identity theft-related incident was almost $20,000.[10] More than half of victims had to pay for care that they did not receive out of their own pockets to restore coverage due to health insurance or Medicare fraud perpetrated using their PlI/PHI.[11]

69.     The costs to victims, incurred through no fault of their own, can therefore be extensive.  However, even after investing substantial time and money into responding to a breach, there is no guarantee that victims will be able to adequately protect themselves or secure their information.

70.     Indeed, fewer than 10% of the Ponemon survey respondents stated that their matter was completely resolved with their identity restores, and 40% reported that they were not able to resolve the resulting fraud.[12]

---

[9] https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.
[10] *Id.*
[11] *Id.*
[12] *Id.*

***Unauthorized Access to PII Presents Separate and Distinct Risks of Identity Theft and the Attendant Damages***

71.     In addition to the harms and risks specific to unauthorized access to PHI, there are additional, distinct risks associated with the improper disclosure of PII.

72.     Data thieves and hackers specifically target PHI from healthcare institutions for the reasons described herein, including the increased value of this information in comparison to other PII. However, the harm that can be inflicted by bad actors with access to victims' PII are comparably serious and difficult to mitigate/remedy.

73.     Thieves and other bad actors can use illegally obtained PII to destroy the victim's financial profiles by "using the victim's credit card or taking loans in their name."[13] Additionally, "[a]ttackers often leverage stolen data to commit more crimes, by breaking into accounts, transferring funds, [and] perpetrating fraud."[14]

74.     Although oftentimes the identity theft that results from data breaches results in primarily financial harms, there is the substantial possibility that it can also ruin a victim's good name. Using stolen PII, cybercriminals may fraudulently procure identification, such as a driver's license, in the victim's name, use the victim's PII to apply for loans or government benefits, or even file for tax returns in the victim's name. In some cases, a thief may even give the victim's name to the police during an arrest.[15]

75.     Even after identity theft occurs as a result of a data breach and the victim becomes aware, the victim faces an uphill battle to reclaim their identity and clean up the financial and reputational carnage resulting from the fraud.

---

[13] https://www.f-secure.com/us-en/articles/why-do-hackers-want-your-personal-information.
[14] https://www.lmgsecurity.com/what-hackers-do-with-stolen-data-how-to-reduce-risk-after-data-is-taken/.
[15] https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

76.     According to a report from the Government Accountability Office ("GAO Report"), "stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use for that information may continue for years." [16]

77.     Therefore, victims are required to expend the substantial time and money necessary to respond to identity theft multiple times once their PII is posted and sold on the Internet.

78.     Despite the wealth of evidence that healthcare institutions are frequently targeted by cybercriminals due to the valuable PII/PHI that these institutions possess and the knowledge that a data breach would expose patients to a highly increased risk of identity theft and other harms, Defendant affirmatively failed to implement proper training and other security protocols necessary to adequately protect patients' most sensitive information from unauthorized disclosure.

### *Common Injuries & Damages*

79.     Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); and (d) the continued risk to their PII, which remains in the possession of Defendant,

---

[16] United States Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Victims' Risk of Identity Theft*

80.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Social Security number falling into the hands of identity thieves.

81.    The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the modus operandi of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

82.    Further, the standard operating procedure for cybercriminals is to use some data, like the Social Security numbers here, to access "fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[17]

83.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to

---

[17] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

84.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

### *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

85.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

86.    The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

87.    By spending this time, data breach Plaintiff is not manufacturing his own harm, they are taking necessary steps at Defendant's direction and because the Data Breach included his Social Security number.

88.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because

of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

89.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[18]

90.     These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[19]

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

91.     Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

92.     Such fraud may go undetected for years; consequently, Plaintiff and Class Members

---

[18] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[19] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

are at a present and continuous risk of fraud and identity theft for many years into the future.

93.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

***Plaintiff's Experience***

94.    Plaintiff is a current patient of Defendant, and has been a patient for approximately 30 years.

95.    Plaintiff takes reasonable measures to protect his Private Information.

96.    In the Data Breach, Plaintiff's Private Information was compromised and stolen by identity thieves who illegally accessed Defendant's network for the specific purpose of targeting the Private Information.

97.    Because of the Data Breach, Plaintiff has suffered a significant loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. He has and will continue to monitor accounts and credit scores and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and work duties.

98.    Plaintiff also suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that he entrusted to Defendant for the purpose of obtaining services from Defendant, which was compromised in, and because of, the Data Breach.

99.     Plaintiff suffered lost time, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

100.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and/or email messages.

101.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

102.    Because of the sensitivity of the Private Information disclosed through Defendant's failures, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

## CLASS ACTION ALLEGATIONS

103.    Pursuant to the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed class defined as:

> All individuals residing in the United States whose PII and PHI was compromised in the Data Breach including all those who received a notice of the Data Breach. (the "Class").

104.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

105.    Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

106.    The proposed Class satisfies the numerosity, commonality, typicality, and adequacy requirements under Federal Rule of Civil Procedure 23.

107.    <u>Numerosity.</u> The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

108.    <u>Commonality.</u> There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Defendant engaged in the conduct alleged herein;

    b.    Whether Defendant's conduct violated the FTC Act;

    c.    When Defendant learned of the Data Breach;

    d.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII and PHI compromised in the Data Breach;

    e.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    f.    Whether Defendant's data security systems, prior to and during the Data Breach, were consistent with industry standards;

    g.    Whether Defendant owed duties to Class Members to safeguard their PII

and PHI;

  h. Whether Defendant breached its duties to Class Members to safeguard their PII and PHI;

  i. Whether hackers obtained Class Members' PII and PHI via the Data Breach;

  j. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

  k. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

  l. Whether Defendant knew or should have known its data security systems and monitoring processes were deficient;

  m. What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

  n. Whether Defendant's conduct was negligent;

  o. Whether Defendant breached contracts it had with its clients, which were made expressly for the benefit of Plaintiff and Class Members;

  p. Whether Plaintiff and Class Members are entitled to damages;

  q. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

  r. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

109. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

110. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

111. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

112. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

113.    Further, this action satisfies Fed. R. Civ. P. 23 because: (i) common questions of law and fact predominate over any individualized questions; (ii) prosecuting individual actions would create a risk of inconsistent or varying adjudications, risking incompatible standards of conduct for Defendant, and a risk adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; and (iii) the Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

114.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notification letters.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

115.    Plaintiff incorporates the above allegations as if fully set forth herein.

116.    Plaintiff and Class Members provided their non-public PII and PHI to Defendant as a condition of receiving medical services from Defendant.

117.    Defendant had full knowledge of the sensitivity of the PII and PHI, and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

118.    By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

119.    Defendant had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

120.    Defendant's duty to use reasonable security measures also arose under the common law, and as informed by the FTC Act, which mandates that Defendant implement reasonable cybersecurity measures.

121.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII and PHI.

122.    Defendant had and continues to have duties to adequately disclose that the PII and PHI of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII and PHI by third parties.

123.    Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII and PHI. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.      Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII and PHI;

b.      Failing to adequately monitor the security of its networks and systems, including by failing to implement reasonable monitoring, logging, and alerting systems such as EDR/XDR, data loss prevention tools, and a centralized security event management system;

c.      Allowing unauthorized access to Class Members' PII and PHI;

d.      Failing to detect in a timely manner that Class Members' PII and PHI had been compromised;

e.      Failing to remove Plaintiff's and Class Members' PII and PHI it was no longer required to retain pursuant to regulations; and

f.      Failing to implement a reasonable cybersecurity incident response plan that would have enabled Defendant to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

124.    Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

125.    Defendant's violation of the FTC Act also constitutes negligence per se, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

126.    Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully

lost and disclosed to unauthorized third persons because of the Data Breach.

127.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

128.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

129.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

130.    As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

131.    Additionally, as a direct and proximate result of Defendant's negligence and

negligence per se, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

132.    Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

133.    Given Defendant's failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendant's decision not to invest enough resources in its cyber defenses amounts to gross negligence.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

134.    Plaintiff realleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

135.    Defendant required Plaintiff and the Class to provide and entrust their Private Information as a condition of receiving medical and healthcare services.

136.    Plaintiff and the Class paid money to Defendant in exchange for services, as well as Defendant's promises to protect their Private Information from unauthorized disclosure.

137.    Defendant implicitly promised to implement reasonable, industry standard cybersecurity measures, as well as to comply with HIPAA, and to make sure that Plaintiff and Class Members' Private Information would remain reasonably protected.

138.    As a condition of receiving medical and healthcare services with Defendant, Plaintiff and the Class provided and entrusted their Private Information to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed

to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

139.    A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide accurate and complete Private Information and to pay Defendant in exchange for Defendant's collective agreement to, *inter alia*, protect their Private Information. Indeed, no reasonable person would agree to patron a healthcare facility that admitted up front that it was not prepared to protect PHI with reasonable cybersecurity measures.

140.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of Defendant's implied promise to adequately safeguard this confidential personal and medical information.

141.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

142.    Defendant has breached the implied contracts it made with Plaintiff and the Class by making their Private Information accessible from the internet (regardless of any mistaken belief that the information was protected) and failing to make reasonable efforts to use the latest security technologies designed to help ensure that the Private Information was secure, failing to encrypt Plaintiff's and Class Members' Private Information, failing to safeguard and protect their Private Information, and by failing to provide timely and accurate notice to them that Private Information was compromised as a result of the data breach.

143.    Defendant's failure to meet its promises constitutes a breach of the implied contracts.

144.    By allowing unauthorized access to Plaintiff's and Class Members' Private

Information and failed to safeguard the Private Information, Defendant breached its contracts with Plaintiff and Class Members.

145.    Indeed, Defendant breached its contracts by not meeting the minimum level of protection of Plaintiff's and Class Members' protected health information and other Private Information, because Defendant did not prevent against the Data Breach.

146.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are now subject to the present and continuing risk of fraud, and are suffering (and will continue to suffer) the ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

147.    As a result of Defendant's breach of implied contract, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages.

**COUNT III**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

148.    Plaintiffs and the Class re-allege and incorporate all the above allegations.

149.    Plaintiffs and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

150.    Plaintiffs' and Class Members' efforts to safeguard their own Private Information

were successful, as their Private Information was not known to the public prior to the Data Breach.

151. Plaintiffs and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

152. Defendant owed a duty to its patients, including Plaintiffs and the proposed Class Members, to keep their Private Information confidential.

153. The unauthorized release of Private Information is highly offensive to any reasonable person.

154. Plaintiffs' and Class Members' Private Information is not of legitimate concern to the public.

155. Defendant knew or should have known that Plaintiffs' and Class Members' Private Information was private.

156. By intentionally failing to keep Plaintiff' and Class Members' PII and PHI safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff' and Class Members' privacy by:

    a. Intentionally and substantially intruding into Plaintiff' and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

    b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

    c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

157. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of

Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. B.

158.    Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

159.    Defendant knew that an ordinary person in Plaintiffs' or Class Members' position would consider the exposure of their PII and PHI to be highly offensive and objectionable.

160.    Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their PII and PHI without their informed, voluntary, affirmative, and clear consent.

161.    Moreover, given that stolen PII and PHI is then publicized and traded on the dark web and through Telegram channels, Defendant knew or was substantially certain that its failure to implement reasonable cybersecurity safeguards would lead to the publication of Plaintiffs' and the Class Members' PII and PHI to a large group of the public and/or to a large group of individuals who are in a special relationship with Plaintiff' and the proposed Class Members, in that those individuals are exactly the type of people that Plaintiffs and the Class Members have a special interest in ensuring their PII and PHI is kept confidential from given that those individuals are known identity thieves and fraudsters.

162.    The conduct described above was at or directed at Plaintiffs and the Class Members.

163.    As a proximate result of such intentional misuse and disclosures, Plaintiffs and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted.

Defendant's conduct amounted to a substantial and serious invasion of Plaintiffs' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

164.    In failing to protect Plaintiffs' and Class Members' PII, and in intentionally misusing and/or disclosing their PII, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private. Plaintiffs therefore, seek an award of damages on behalf of themselves and the Class.

165.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class Members' privacy by Defendant.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and all Class Members)**

166.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

167.    This count is pleaded in the alternative to the Breach of Implied Contract claim (Count II) above.

168.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and Class Members.

169.    Accordingly, a portion of the payments made by or on behalf of Plaintiff and the

Class are to be used to provide a reasonable and adequate level of data security. The precise amount from each payment allocated to data security is known to Defendant and is expected to be disclosed through the course of discovery.

170.    Plaintiff and the Class Members conferred a substantial monetary benefit on Defendant, specifically in the form of their PII, PHI, and money paid to Defendant in connection with their contract for medical care and treatment services. In so doing, Plaintiff and the Class Members provided Defendant with their PII/PHI based on the understanding that the benefits derived therefrom, at least in part, would be used to fund adequate data security measures and training.

171.    In exchange for the monetary benefits that Plaintiff and the Class conferred upon Defendant, they should have both (1) received medical care and treatment services and (2) had their PII/PHI securely stored.

172.    Defendant knew that Plaintiff and the Class conferred upon it a benefit which Defendant accepted, thus profiting from these transactions. In particular, Defendant enriched itself by saving the costs is reasonably could and should have expended on reasonably adequate data security measures and training to secure Plaintiff's and the Class's PII/PHI exchanged in part for the services provided by Defendant.

173.    However, instead of providing sufficient data security measures and training that would have prevented the Data Breach, Defendant instead chose to increase its own profits at the expense of Plaintiffs and the Class by employing cheaper, less effective security measures and training. Plaintiff and the Class suffered as a direct and proximate result of Defendant's decision to unjustly prioritize its own profits over the security of its patients' most sensitive PII/PHI.

174.    Under the principles of equity and good conscience, Defendant should not be

permitted to retain the money imparted to it by Plaintiff and the Class because Defendant failed to use such money to implement adequate data security measures and training that are mandated by applicable laws and industry standards.

175. Defendant failed to employ reasonably adequate measures and training to secure Plaintiff's and the Class's PII/PHI, and, therefore, deprived Plaintiff and the Class of full compensation in return for the benefit that they provided.

176. In failing to provide full compensation that Plaintiff and the Class deserved, Defendant acquired the PII/PHI of Plaintiff and the Class through inequitable means. Defendant did not disclose the inadequate security practices as alleged herein.

177. If Plaintiff and the Class knew that Defendant had failed to employ data security measures and training adequate to secure their PII/PHI, they would not have agreed to provide such private information to Defendant.

178. Plaintiff and the Class have no adequate remedy at law.

179. As a direct and proximate result of Defendant's misconduct, Plaintiff and the Class have suffered and will continue to suffer injuries, including but not limited to: (a) continued risk to their PII/PHI, which remains in Defendant's possession and is thus at risk of further breaches as along as Defendant fails to implement adequate data security measures and training to protect it; (b) invasion of privacy; (c) the loss of benefit of the bargain for money paid and information provided to Defendant; and (d) loss of time and productivity incurred mitigating the increased risk and imminent threat of identity theft.

180. The Court should require Defendant to disgorge into a common fund or a constructive trust, for the benefit of Plaintiff and the Class, proceeds that they unjustly received and retained from them. Defendant should be compelled to refund the excess amounts that Plaintiff

and the Class overpaid for Defendant's medical care and services.

## **PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendant and that the Court grant the following:

A.  For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.  For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.  requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

   iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xv. for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 6, 2025     Respectfully submitted,

*/s/ Kensley R. Barrett  #8657*
Kensley R. Barrett, Esq.
**MARIN BARRETT & MURPHY**
1000 Chapel View Boulevard, Suite 260
Cranston, RI 02920
Tel: (401) 228-8271
kb@marinbarrettmurphy.com

J. Gerard Stranch, IV (BPR # 023045)*
Grayson Wells (BPR # 039658)*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

gwells@stranchlaw.com

*\* pro hac vice forthcoming*

**Counsel for Plaintiff and the Proposed Class**